UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **WAYNE R. GOLD**, Regional Director of The Fifth Region of the National Labor Relations Board, for and on behalf of the **NATIONAL LABOR RELATIONS BOARD** | \* \* \* \* \* |
| 103 S. Gay Street, 8th Floor Baltimore, MD 21202 | \* \* \* |
| **Petitioner,** | \* \* |
| v. | \* **CIVIL No.** \* |
| **DAYCON PRODUCTS COMPANY, INC.** | \* \* |
| John Poole, President Daycon Products Company, Inc. 16001 Trade Zone Avenue Upper Marlboro, MD 20774 | \* \* \* \* \* |
| **Respondent.** | \* \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITION FOR INTERIM RELIEF PURSUANT TO SECTION 10(j) OF THE
NATIONAL LABOR RELATIONS ACT, AS AMENDED**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

I.    STATEMENT OF THE CASE ............................................................. 1

II.   STATEMENT OF THE FACTS ........................................................... 4

III.  THE STATUTORY SCHEME PURSUANT TO WHICH INJUNCTIVE RELIEF IS
      SOUGHT: THE APPLICABLE STANDARDS ........................................... 20

IV.   ARGUMENT ..................................................................................... 23

V.    CONCLUSION .................................................................................. 36

## TABLE OF AUTHORITIES

### FEDERAL STATUTES

29 U.S.C. §157................................................................................2
29 U.S.C. §158(a)(1), (3) and (5)............................................... 1
29 U.S.C. §159(a)..................................................................... 1
29 U.S.C. §160(j) .................................................................. 1, 15
61 Stat. 149 ............................................................................. 1
73 Stat. 544 ............................................................................. 1

### SUPREME COURT CASES

NLRB v. Katz, 369 U.S. 736 (1962)............................................. 32
Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539
   (1988).................................................................................25
Mackay Radio & Telegraph Co. v. NLRB, 304 U.S. 333 (1938)......................27
Mastro Plastics Corp., v. NLRB 350 U.S. 270 (1956)............................26
NLRB v. Fleetwood Trailer Co., 389 U.S. 375 (1967)............................26
Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982) ........................... 23
Winter v. Natural Resources Defense Council, Inc., ___ U.S. ___, 129 S.Ct. 365 (2008).........21

### CIRCUIT AND DISTRICT COURT CASES

Aguayo v. Tomco Carburetor Co., 853 F.2d 744 (9th Cir. 1988)................................31, 33
Asseo v. Bultman Enterprises, Inc., 913 F. Supp. 89 (D. P.R. 1995)................................33
Asseo v. Pan American Grain Co., Inc., 805 F.2d 23 (1st Cir. 1986) ........................................ 31
Bloedorn v. Francisco Foods, Inc, 276 F.3d 270 (7th Cir. 2001).........................................passim
Blyer v. Pollari Electric, 141 F. Supp. 2d 326 (E.D.N.Y. 2001).......................................30
D'Amico v. Townsend Culinary, Inc., 22 F. Supp. 2d 480 (D. Md. 1998) ................................. 33
D'Amico v. United States Service Industries, Inc., 867 F. Supp. 1075 (D.D.C. 1994)........30, 34
Danielson v. Jt. Board, 494 F.2d 1230 (2d Cir. 1974)............................................ 22
Dorsey Trailers, Inc. v. NLRB, 233 F.3d 831 (4th Cir. 2000)............................................28
Dunbar v. Onyx Precision Services, Inc., 129 F. Supp. 2d 230 (W.D.N.Y. 2000)..................33
Fuchs v. Jet Spray Corp., 560 F. Supp. 1147 (D. Mass. 1983)...................................... 25
Garcia v. Sacramento Coca-Cola Bottling Company, Inc., ___F. Supp.2d ___, 2010 WL
   3294384 (E.D. Cal. Aug. 20, 2010)................................................................21, 22
Gottfried v. Frankel, 818 F.2d 485 (6th Cir. 1987)..............................................25
Gottfried v. Mayco Plastics, Inc., 472 F. Supp. 1161 (E.D. Mich. 1979)...........................33
Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047 (2d Cir. 1980) ..................................... 25
Kobell v. Beverly Health & Rehabilitation Services, Inc., 987 F. Supp. 409
   (W.D. Pa. 1997)..................................................................................33
Lineback v. Spurlino Materials, LLC, 546 F.3d 491 (7th Cir. 2008)..............................35
Miller v. Cal. Pac. Med. Ctr., 19 F.3d 449 (9th Cir. 1994)........................... 21, 22, 23
Morio v. North American Soccer League, 632 F.2d 217 (2d Cir. 1980).............................. 31, 32
Muffley v. APL Logistics, 2008 WL 544455 (W.D. Ky. 2008)...........................................32
Muffley v. Spartan Mining Co., 570 F.3d 534 (4th Cir. 2009)....................................passim
NLRB v. Cast Optics Corp., 458 F. 2d 398 (3rd Cir. 1972).........................................27

NLRB v. Electro-Voice, Inc., 83 F.3d 1559 (7th Cir. 1996). ........................................... 23, 30, 31
NLRB v. Fitzgerald Mills Corp., 313 F.2d 260 (2d Cir. 1963)................................26, 27
NLRB v. Hardesty Co., Inc., 308 F.3d 859 (8th Cir. 2002)......................................31
Norelli v. Fremont-Rideout Health Group, 632 F. Supp. 2d 993 (E.D. Cal. 2009)................32
Overstreet v. El Paso Disposal, LLC, 668 F. Supp. 2d 988 (W.D. Tex. 2009).....................32
Overstreet v. El Paso Disposal, L.P., __F.3d__, 2010 WL 4351961
    (5th Cir. November 4, 2010)..............................................................29, 35
Overstreet v. Thomas Davis Medical Centers, P.C., 9 F. Supp. 2d 1162 (D. Ariz. 1997) ........... 32
Pascarell v. Orit Corp., 705 F. Supp. 200 (D.N.J. 1988)................................................30
Pye v. Excel Case Ready, 238 F.3d 69 (1st Cir. 2001)..................................................31
Scott v. Stephen Dunn & Assocs., 241 F.3d 652 (9th Cir. 2001) .............................. 21, 23, 33, 34
Seeler v. Trading Port, Inc., 517 F.2d 33 (2d Cir. 1975)................................................ 24
Silverman v. Imperia Foods, Inc., 646 F. Supp. 393 (S.D.N.Y. 1986)............................31
Silverman v. Major League Baseball Player Relations Committee, Inc., 880 F. Supp. 246
    (S.D.N.Y. 1995)........................................................................................ 32
Southwest Forest Industries, Inc. v. NLRB, 841 F.2d 270 (9th Cir. 1988).........................32
Teamsters Local 515 v. NLRB, 906 F.2d 719 (D.C. Cir. 1990)......................................27
The Real Truth About Obama, Inc. v. Federal Election Commission, 575 F.3d 342 (4th Cir.
    2009)..................................................................................................21

## NATIONAL LABOR RELATIONS BOARD CASES

Associated Grocers, 253 NLRB 31 (1980)..........................................................27
Child Development Council of Northeast Pennsylvania, 316 NLRB 1145 (1995)................27
Citizens National Bank of Willmar, 245 NLRB 389 (1979)..........................................27
Desert Pines Club, 334 NLRB 265, 268 (2005).....................................................15
Florida-Texas Freight, Inc., 203 NLRB 509 (1973) ................................................ 32
Grinnell Fire Protection Systems Co., 328 NLRB 585 (1999).....................................25
Hansen Bros. Enterprises, 279 NLRB 741 (1986).................................................27
Herman Sausage Co., 122 NLRB 168 (1958) ................................................... 32
Laidlaw Corp., 171 NLRB 1366 (1968).............................................................28
Little Rock Downtowner, Inc., 168 NLRB 107 (1967) ............................................ 32
McCallister Towing & Transportation Co., 341 NLRB 394 (2004)...............................12
Newcor Bay City Division of Newcor, 345 NLRB 1229 (2005)....................................25
North Star Steel Co., 305 NLRB 45 (1991)........................................................25
RCG (USA) Mineral Sands, Inc., 332 NLRB 1633 (2001)........................................27
Silverman v. Reinauer Transportation Companies, 1988 WL 159172
    (S.D.N.Y. Nov. 15, 1988)...........................................................................30

## OTHER CITED MATERIAL

Basic Guide to the National Labor Relations Act.......................................................1

## I.  STATEMENT OF THE CASE

This proceeding is before the Court on a Petition for Interim Relief filed by Wayne R. Gold, the Regional Director of Region Five of the National Labor Relations Board ("Petitioner" or "the Board"), pursuant to Section 10(j) of the National Labor Relations Act, as amended (61 Stat. 149; 73 Stat. 544; 29 U.S.C. 160(j)) ("the Act").  The Act is the primary federal law governing relations between unions and employers in the private sector.[1]  Daycon Products Company, Inc. ("Respondent") is a District of Columbia corporation engaged in the business of manufacturing and distributing janitorial, maintenance and hardware supplies.  Respondent maintains an office and place of business in Upper Marlboro, Maryland, within this judicial district.  Petitioner seeks a preliminary injunction to require Respondent to:  (1) upon request, meet and bargain in good faith with the union that represents its employees at its Upper Marlboro facility; (2) upon request, rescind any or all of the unilateral changes Respondent made to its employees' terms and conditions of employment on April 23, 2010; and (3) offer interim reinstatement to employees who exercised their statutory right to strike, pending final disposition of the administrative cases.

On four separate occasions over the spring and summer of 2010, the labor organization that represents Respondent's employees, the Drivers, Chauffeurs and Helpers Local Union No. 639[2] ("the Union"),[3] filed an unfair labor practice charge, alleging that Respondent violated Sections 8(a)(1), (3), and (5) of the Act (29 U.S.C. § 158(a)(1), (3) and (5)).[4] (Exh. A at GC

---

[1] See generally "Basic Guide to the National Labor Relations Act," available at www.nlrb.gov.
[2] Drivers, Chauffeurs and Helpers Local Union No. 639 is affiliated with the International Brotherhood of Teamsters.
[3] See generally Section 9(a) of the Act.  29 U.S.C. § 159(a).
[4] Petitioner is not seeking any interim relief regarding the initial administrative charge, docketed as Case 5-CA-35687.

Exhs. 1-A, 1-C, 1-E, and 1-G).[5]  Respectively, these sections prohibit an employer from: interfering with, restraining, or coercing employees in the exercise of the rights guaranteed in Section 7 of the Act;[6] discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; and refusing to bargain in good faith with the collective-bargaining representative of its employees.

The allegations arise from the bargaining that took place between the Union and Respondent for a successor collective-bargaining agreement, beginning in the fall of 2009.  Since 1973, the Union has represented a unit of employees at Respondent's Upper Marlboro facility. The parties began bargaining for a successor collective-bargaining agreement in November 2009. On April 22, 2010,[7] Respondent unilaterally declared that the parties were at an impasse in their negotiations, and Respondent unilaterally changed its employees' terms and conditions of employment the following day, Friday, April 23.  The next workday, Monday, April 26, Respondent's employees initiated a strike against Respondent, protesting Respondent's unfair labor practice of unilaterally changing their terms and conditions of employment without first reaching a good-faith impasse with the Union.  On July 2, the Union notified Respondent that its employees were unconditionally offering to return to work on the following workday, July 6. However, on that date, Respondent did not allow its employees to return to work.

---

[5] With his petition for interim relief, Petitioner is relying upon, and submitting to the Court as Exhibit A, the administrative record developed before an Administrative Law Judge of the Board.  All citations to Exhibit A will include a citation to the transcript ("Tr. [page numbers]") and/or the exhibit number from the administrative record (e.g., "GC Exh. [exhibit number]").  In addition, Petitioner is submitting two supplemental affidavits as exhibits, Exhs. B and C.

[6] Briefly, Section 7 of the Act grants employees numerous rights, including the right to form, join, or assist labor organizations (unions), to bargain collectively about their terms and conditions of employment through a collective-bargaining representative of their own choosing, and or engage in other concerted activity for the purposes of collective bargaining or their mutual aid or protection.  29 U.S.C. § 157.

[7] Unless otherwise noted, all dates are in 2010.

Petitioner investigated the alleged unfair labor practices, and analyzed the facts developed from that investigation. Regarding the unfair labor practice charge (5-CA-35738) that Respondent unlawfully changed employees' terms and conditions of employment without first reaching a good-faith impasse in negotiations with the Union, Petitioner concluded that Respondent had not established the existence of a good-faith impasse, and thus that Respondent's changes of April 23 violated Sections 8(a)(1) and (5) of the Act. Consequently, Petitioner also decided that Respondent similarly violated Sections 8(a)(1) and (5) by failing to rescind those unilateral changes (5-CA-35994). As for the unfair labor practice charge (5-CA-35965) that Respondent unlawfully refused to reinstate former unfair labor practice strikers who had made an unconditional offer to return to work, Petitioner initially determined that the strike was an unfair labor practice strike (as opposed to an economic strike) because the strike was caused by Respondent's unfair labor practice of unilaterally changing employees' terms and conditions of employment. As discussed below, unfair labor practice strikers are entitled to immediate reinstatement upon an unconditional offer to return to work. Thus, Petitioner concluded that Respondent's refusal to reinstate the employees after their unconditional offer to return to work violated Sections 8(a)(1), (3), and (5) of the Act. Furthermore, even if the employees were not considered to be unfair labor practice strikers, Petitioner determined that Respondent did not establish that its employees had been permanently replaced; thus, Petitioner determined that the strikers were entitled to reinstatement on July 6. Consequently, Petitioner issued a Complaint and Notice of Hearing, alleging that Respondent had engaged in and is engaging in unfair labor practices in violation of the Act.[8]  Respondent filed Answers to each

---

[8] Petitioner subsequently issued a Consolidated Complaint and Notice of Hearing, and a Second Consolidated Complaint. (Exh. A at GC Exh. 1-M and 1-P). Petitioner also amended the Second Amended Complaint at the administrative hearing. (Exh. A at Tr. 9-13).

iteration of the Complaint. (Exh. A at GC Exh. 1-L, 1-O, and 1-R; Exh. A at Tr. 13). A hearing was held on November 17-22, before an Administrative Law Judge of the Board.

This memorandum will first describe the facts of the case. Next, it will set forth the applicable standards for determining whether injunctive relief is necessary to protect employees' rights under the Act. Applying these standards to the facts of this case, the memorandum will demonstrate that, in light of all of the evidence, Petitioner will likely succeed on the merits. Furthermore, it will argue that, in balancing the equities, the risk of irreparable injury—to employees' exercise of their Section 7 rights, to the Union's ability to bargain effectively on behalf of the employees that it represents, and to the Board's ability to effectively remedy violations of the Act—outweigh any harm that injunctive relief might cause to Respondent. Finally, this memorandum will discuss the strong public interest in preserving employees' Section 7 rights, thus establishing that injunctive relief is warranted in the matter before this Court.

## II. STATEMENT OF THE FACTS

For many years, the Union has served as the collective-bargaining representative for a unit of Respondent's employees working at Respondent's Upper Marlboro facility.[9] As part and parcel of this collective-bargaining relationship, Respondent and the Union have agreed on collective-bargaining agreements in the past, memorializing the terms and conditions of employment for Respondent's employees. (Exh. A at GC Exh. 63). The parties' most recent collective bargaining agreement was in effect from March 3, 2007 through January 31, 2010.

---

[9] The unit is composed of all drivers, warehousemen, chemical compounders, utility employees, and repairmen of the Company employed at its 16001 Trade Zone Avenue, Upper Marlboro, MD 20774 location; but excluding office clerical employees, salesmen, professional employees, guards, supervisors, and all other employees. (Exh. A at GC Exh. 2, p. 3, and GC Exh. 63, p. 3).

(Exh. A at GC Exh. 2). With that agreement approaching its expiration date, the parties began

negotiating for a successor collective-bargaining agreement on November 4, 2009. (Exh. A at

Tr. 50). The Union's bargaining committee was led by Doug Webber, a business agent for the

Union. The Union committee also included three employees of Respondent. (Exh. A at Tr. 48-

49). On the other side, Respondent's bargaining committee was led by outside counsel Jay

Krupin, and another outside counsel, Paul Rosenberg; also included in Respondent's committee

were John Poole (Respondent's President), Jodie Kendall (Respondent's Human Resources

Director), Joe Giusto (Respondent's Vice President of Manufacturing); and Howard Cohen

(Respondent's Owner). (Exh. A at Tr. 49-50.)

At this initial session, Respondent raised the prospect of a performance-based wage

system. (Exh. A at Tr. 56-57). Webber immediately opposed moving away from the hourly

wage structure that the parties historically used. (Exh. A at Tr. 57 and 599). Krupin indicated

that Respondent could not commit to a contract that looked like the prior contract. (Id.). That

contract, which was scheduled to expire on January 31, 2010, contained two different types of

pay increases: (1) an annual wage increase; and (b) a "catch-up" wage increase in which

employees who were below the top rate of pay for their respective job classification received an

additional increase on their anniversary of date-of-hire, until such time as they reached the top

rate for their job classification. (Exh. A at GC Exh. 2, pp.13-15). Respondent did not present

any proposals at this meeting. (Exh. A at Tr. 58). However, Webber presented the Union's

written non-economic proposals, and the parties agreed to some stylistic and language changes.

(Exh. A at Tr. 60-63 and GC Exhs. 5-6). Towards the end of the meeting, Krupin asked that the

Union make its economic proposals. (Exh. A at GC Exh. 5, p. 2).[10]  Rosenberg followed up with

a letter to Webber, requesting that the Union make its economic proposals by December 1, 2009.

(Exh. A at Tr. 64-65 and GC Exh. 7).  Webber replied that the Union would be prepared to

continue discussing the open non-economic issues at the parties' next bargaining session

(scheduled for December 9, 2009), and that Webber anticipated that the Union would make its

economic proposals at that time.  (Exh. A at Tr. 65 and GC Exh. 8).

On that date, the parties met, and Webber presented the Union's economic proposal.

(Exh. A at GC Exh. 10).  Webber made clear to Respondent that the Union's presentation of its

economic proposal did not mean that the non-economic portions had been resolved.  (Exh. A at

Tr. 67).  The Union's proposal included an annual wage increase of $.75/hr for all employees.

(Exh. A at GC Exh. 10, p. 3, and Tr. 74-75).  The Union also proposed an expansion of the

"catch up" increase from the then-existing collective-bargaining agreement.[11]  (Id. and Tr. 70-

75).  Under this proposed expansion of the "catch up" increase, all employees who were hired

before February 1, 2008 were to immediately be elevated to the top rate of pay in their respective

classification.  (Exh. A at GC Exh. 10, p. 3, and Tr. 72-73, 245-46).[12]  As for existing employees

hired after February 1, 2008, as well as any new employees hired during the life of the

collective-bargaining agreement, their wages would be slotted along the following progression:

---

[10] The parties' prior negotiations followed a pattern of addressing non-economic issues first, and
then addressing economic issues.  (Exh. A at Tr. 220).
[11] Webber testified that this concept, referred to by the parties as "catch up" or "progression,"
was the most important issue for the Union in the negotiations.  (Exh. A at Tr. 222).
[12] The parties previously utilized a similar wage progression, under which an employee would
receive "catch-up" raises on the anniversary of their date of hire (as well as an annual increase),
until they reached the top wage rate for their respective classification; it was a three-year
progression to the top rate.  (Exh. A at Tr. 595-96 and 658, and GC Exh. 62, p. 13 and 35).  At
some point in 2004, the parties agreed to not include "catch up" raises in their collective-
bargaining agreement, but the concept of "catch up" raises returned in the parties' 2007-2010
collective-bargaining agreement.  (Exh. A at Tr. 596 and GC Exh. 2, pp. 13-15).

| | | |
|---|---|---|
| Hire date | - | Employee is paid 85% of top rate |
| 1 year anniversary of hire date | - | Employee is paid 90% of top rate |
| 2 year anniversary of hire date | - | Employee is paid 95% of top rate |
| 3 year anniversary of hire date | - | Employee is paid 100% of top rate |
| | | (Id. and Tr. 73-74, 247-48). |

After Webber presented the Union's initial economic proposal, Krupin ended the meeting by stating that Respondent would have to cost out the Union's economic proposal. (Exh. A at Tr. 76 and 661, and GC Exh. 9). Respondent did not present any proposals at this meeting. (Exh. A at Tr. 76).

On December 15, 2009, the parties held a third bargaining session. (Id.). At the beginning of the meeting, Rosenberg said that the Union's economic proposal was not in line with today's economic climate and would cost Respondent nearly $3 million. (Exh. A at Tr. 78-79 and GC Exh. 11, p. 1). Rosenberg reiterated that Respondent wanted to change the wage structure to one where employees' wages were performance-based. (Id.). Rosenberg presented a proposed collective-bargaining agreement on behalf of Respondent, but the proposal left open the issue of employees' wages. (Exh. A at GC Exh 12, pp. 13-14, and Tr. 81-82). Rather, Rosenberg said that it was not prudent for Respondent to make a counteroffer. (Exh. A at Tr. 79 and GC Exh. 11, p. 1).

On January 5, the parties met for their fourth bargaining session. (Exh. A at Tr. 82, 84). At this session, Krupin handed out an agenda for the meeting, seeking to narrow the scope of the negotiations. (Exh. A at Tr. 85-86 and GC Exhs. 13-14). Krupin suggested that the Union do the same and limit the scope of negotiations to only a few issues. (Exh. A at Tr. 88 and GC Exh. 13). Webber responded that the Union was not willing to do that. (Id.). Respondent still had not provided the Union with a written counterproposal addressing employees' wages.

On January 19, the parties met for a fifth bargaining session. (Exh. A at Tr. 89).  The
meeting started with Krupin claiming that the Union's proposal would cost around $2.7
million, and that he would take the first "shot" at a new proposal. (Exh. A at Tr. 91 and GC
Exh. 15, p. 1).  However, Respondent's President, John Poole, added that he wanted some type
of incentive-based compensation for employees. (Id.).  Krupin presented Respondent's first
written economic proposal,[13] under which each individual employee would receive a 1%
increase in wages in each year of a three-year contract, and be eligible for up to a 3% increase
if the individual employee met conceptual performance and productivity criteria which had not
been fully formed. (Exh. A at Tr. 90-91 and 679-81, and GC Exh. 16).[14]  Webber replied that
the Union was not interested in changing from the established hourly wage rate, nor was the
Union interested in changing to percentage-based wage increases. (Exh. A at Tr. 91-92, 251,
and 602-03).  Rather, Webber said that the Union wanted "cents on the dollar" wage increases,
or defined monetary wage increases. (Id. and GC. Exh. 15).  Krupin responded that
Respondent did not want "cents on the dollar" increases without there being some tie to
employees' performance. (Id.).  Additionally, Krupin proposed a clause for the collective-
bargaining agreement pertaining to economic distress, under which employees' wages would
be frozen any time the Respondent's gross revenue dropped 5% or more. (Exh. A at Tr. 93-94
and GC Exh. 16, p. 2).[15]  Webber rejected Krupin's proposed economic distress clause. (Exh.
A at Tr. 94-96).

---

[13] In its proposal, Respondent indicated that, for issues not addressed by its proposal, it was
willing at the time to retain the language from the parties' existing collective-bargaining
agreement. (Exh. A at GC Exh. 16, p. 3).
[14] John Poole testified that Respondent's proposal was an effort to try to get employees a
$1/hour, or 5%, wage increase. (Exh. A at Tr. 602 and 673).
[15] Respondent never experienced a 5% decrease in revenue in 30 years. (Exh. A at Tr. 607-08).

On January 29, the parties held their sixth bargaining session. (Exh. A at Tr. 97). At the

beginning of this meeting, Krupin proposed the same performance-based wage increases that

he had proposed, and Webber had rejected, at the parties' prior meeting. (Exh. A at Tr. 100

and GC Exh. 18). Later in the meeting, Krupin submitted a revised proposal on employees'

wages, withdrawing the suggested bonus program. (Exh. A at GC Exh. 19).[16] Krupin's

proposal reflected a two-tiered approach to wages, one for employees who were at the top rate

for their classification, and a second tier for employees who were not at the top rate:

Increases for Employees at "Top Rate"
Date of Ratification (DOR)          2%  (or $0.34/hour)
1 year from DOR                     1%  (or $0.17/hour)
2 years from DOR                    1%  (or $0.17/hour)

Increases for Employees below "Top Rate"
Date of Ratification   (DOR)        3%  (or $0.50/hour)
1 year from DOR                     1.5%  (or $0.25/hour)
2 years from DOR                    1.5%  (or $0.25/hour)

(Exh. A at GC Exh. 19 and Tr. 106-07).

Krupin's proposal initially involved only percentage increases. When Webber reiterated that

the Union was not interested in percentage increases, Poole proposed the "cents on the dollar"

increases. (Exh. A at Tr. 106). The Union continued to maintain its position, however, that

employees with three years' experience were as valuable to Respondent as any other senior

employee, and that all employees should be at, or in progression to, the top rate of pay in their

respective classifications. (Exh. A at Tr. 108). Subsequently, Webber revised the Union's

economic proposal, withdrawing several economic proposals but adhering to its proposals from

---

[16] According to Poole, Krupin initially presented the Union with a revised proposal, under which
employees at the top rate would receive 1% increases in each of the three years of the contract,
while employees not at the top rate would receive 1.5% increases. (Exh. A at Tr. 603-05 and R.
Exh. 3). Poole testified that Webber rejected this proposal. Webber was not certain whether
Krupin made this proposal. (Exh. A at Tr. 312-13).

December 9, 2009 regarding employees' annual wage increase and progression to the top rate
in their respective classification. (Exh. A at GC Exh. 21 and Tr. 108-10).

On February 18, the parties met for their seventh bargaining session. (Exh. A at Tr. 112).
After Webber briefly raised some pending grievances, Krupin presented Webber with two
documents. (Exh. A at Tr. 113-15 and GC Exhs. 24-25). In one document, Krupin re-
proposed the same wage proposal that he had made at the parties' prior meeting; in the other,
Krupin set forth what he considered were the issues that the parties had tentatively agreed
upon. (Id.). Krupin added that he felt Respondent had made substantial movement in its
proposals, while the Union had not moved off of its proposals. (Exh. A at Tr. 116 and 692).
Subsequently, Krupin revised Respondent's proposal on employees' wages and the proposed
economic distress clause. (Exh. A at Tr. 116 and GC Exh. 26 and 23, p. 1). Regarding wages,
Krupin proposed the following:

> Increases for Employees at "Top Rate"
> Date of Ratification (DOR)      $0.40/hour
> 1 year from DOR                 $0.20/hour
> 2 years from DOR                $0.20/hour
>
> Increases for Employees below "Top Rate"
> Date of Ratification    (DOR)   $0.60/hour
> 1 year from DOR                 $0.30/hour
> 2 years from DOR                $0.30/hour

(Exh. A at GC Exh. 26).

As for the economic distress clause, Krupin proposed increasing the revenue decrease trigger to
6%. (Id.).

Webber rejected Krupin's proposals, while modifying the Union's proposals in response.
(Exh. A at Tr. 117-19 and GC Exhs. 23 and 28). Regarding employees' wages, Webber reduced
the proposed annual increase by $.10/hour in each of the three years of the proposed contract, to

$.65/hour. (Exh. A. at Tr. 122 and GC Exh. 23, p. 2). Additionally, Webber withdrew several of the Union's economic proposals, including those addressing the employees' work week, funeral leave, and vacations. (Id. and GC Exh. 28, pp. 2-4). On the wage progression, Webber corrected an earlier mistake (his prior proposals mistakenly referenced 2008) and clarified that the Union's proposal was that employees hired before February 1, 2007 would receive the top rate in their respective classifications.[17] (Exh. A at Tr. 120, GC Exh. 28, p. 3, and GC Exh. 23, p. 2). Finally, regarding the economic distress clause, Webber rejected Krupin's proposal, but acknowledged that the Union would be willing to discuss economic distress should Respondent ever experience such a decrease in revenue. (Exh. A at Tr. 693-94).

After meeting privately, Krupin modified Respondent's proposal on employees' wages, indicating to the Union that it was its best offer. (Exh. A at Tr. 122-25 and 612, and GC. Exh. 27). Respondent proposed the following:

**Increases for Employees at "Top Rate"**
| | |
|---|---|
| Date of Ratification (DOR) | $0.40/hour |
| 1 year from DOR | $0.40/hour |
| 2 years from DOR | $0.40/hour |

**Increases for Employees below "Top Rate"**
| | |
|---|---|
| Date of Ratification    (DOR) | $0.60/hour |
| 1 year from DOR | $0.60/hour |
| 2 years from DOR | $0.60/hour |

(Exh. A at GC Exh. 27).[18]

Webber rejected the proposal. (Exh. A at Tr. 123). Webber also stated he would contact the Federal Mediation and Conciliation Service (FMCS).[19] (Exh. A at Tr. 616).

---

[17] Webber testified that Krupin asked if the Union needed the progression in the collective-bargaining agreement, to which Webber said yes. (Exh. A at Tr. 260 and GC Exh. 23. p. 2).
[18] Poole testified that, prior to negotiations, he had targeted a range of 3% - 4% increase as an appropriate economic figure, and Respondent's final proposal from February 18 was approaching 3%. (Exh. A at Tr. 709-10). Poole also indicated that Respondent would accept a 5% increase when it was proposing a bonus plan for employees. (Id. at 712).

On March 17, the parties met for their eighth bargaining session. (Exh. A at Tr. 131-32).

The Union's President, Thomas Ratliff, attended this session, as did a mediator from the Federal

Mediation and Conciliation Service (FMCS), Gary Eder. (Id. at Tr. 132-33). At this session,

Webber presented Respondent with a written rejection of Krupin's proposal from the parties'

February 18 meeting, and the Union's proposals on all non-economic and economic issues which

Webber believed remained open. (Exh. A at Tr. 133-37 and GC Exh. 32-34).[20] Respondent did

not make any counterproposals, and Webber and Ratliff decided to end the parties' bargaining

session. (Exh. A at Tr. 139-41).[21] Before leaving, Ratliff opined that the parties were far apart,

told Poole to "get serious," and said that he thought Respondent's treatment of its employees was

an insult. (Exh. A at Tr. 277-78 and 471, and GC Exh. 31).

---

[19] After the parties' February 18 bargaining session, the Union held a meeting with its
membership on February 27. (Exh. A at Tr. 125-28 and GC Exh. 29). At this meeting, Webber
informed the employees about the state of negotiations with Respondent, (Exh. A at Tr. 127-28
and 271-72). Webber commented that the Union believed that Respondent was not bargaining in
good faith. (Exh. A at Tr. 391 and R. Exh. 1). At that time, the Union took a strike vote. (Id.).
A majority of employees voted in favor of a strike. (Exh. A at Tr. 391, 562, and 776). Webber
informed the employees at this meeting that the strike vote was "first step preparation" if a strike
was necessary, but that it was a tool used in bargaining. (Exh. A at Tr. 128).
[20] In addition, Webber also sought some clarification from Krupin regarding employees' health
and welfare contributions, and Webber proposed a new contract clause setting a time limit for
which employees could receive discipline. (Exh. A at Tr. 138-39 and GC Exh. 35).
[21] No evidence of economic analysis was admitted into the administrative record. At the
underlying trial, Respondent attempted to introduce evidence assertedly prepared prior to the
parties' March 17 bargaining session, addressing the economic impact of the Union's proposals.
(Exh. A at Tr. 618-26). The Administrative Law Judge sustained an objection to the introduction
of this testimony, striking it from the record. (Id.). Respondent had not produced certain
documents, which the Administrative Law Judge determined were clearly covered by a subpoena
issued by the Counsel for the Acting General Counsel. (Id.). A "penalty" for the failure of a
subpoenaed party to turn over responsive documents to a subpoena request is that the non-
complying party is prohibited from introducing such evidence into the administrative record.
See, e.g., McCallister Towing & Transportation Co., 341 NLRB 394, 396 (2004)(indicating
variety of sanctions to deal with subpoena noncompliance), enfd. 156 Fed. Appx. 386 (2d Cir.
2005)(unpublished).

On March 26, Ratliff received a phone call from Krupin. (Exh. A at Tr. 425-26 and GC Exh. 56). Krupin asked if Ratliff would have an "off the record" meeting with him and Respondent's representatives to try to reach agreement on a contract. (Exh. A at Tr. 426). Shortly thereafter, Ratliff met with Webber and John Gibson (the Union's Secretary-Treasurer), informed them of the call, and instructed them to clear their schedules to be available for a meeting. (Id. at 427 and 520). On April 1, the parties met for the ninth time. (Exh. A at Tr. 143). Unlike prior meetings, this meeting did not include the full bargaining committee for each side. (Id.). Webber, Ratliff, and Gibson attended on behalf of the Union. (Id.). Krupin, Rosenberg, and John Poole (the Respondent's President) attended on behalf of Respondent. (Id.). At this meeting, held in a private room of a Washington, D.C. restaurant, Webber suggested a four-year collective-bargaining agreement, with the top rate progression extended over four years, rather than three. (Exh. A at Tr. 146-47, 285, 430-31, 523-24, and 630). After Respondent's contingent met privately, Krupin suggested an idea: employees currently making the top rate would receive annual increases, while employees not at the top rate would progress to a mutually agreeable, substandard "contract rate" during the life of the contract. (Exh. A at Tr. 147-48, 292-93, 431, 524, 631-32, and 664-66). The Union met privately, and Webber responded to Krupin by suggesting a five-year collective-bargaining agreement with the top rate progression extended over five years. (Id. at Tr. 148-49, 293, 432, 525, 632, and 667). Krupin said Respondent was going to have to "crunch the numbers," and that he would respond to the Union on the following Tuesday, April 6. (Id. at Tr. 149, 204-05, 432, 525-26, and 634).[22]

---

[22] Webber, Ratliff, and Gibson testified that they felt positively about the direction of negotiations at the conclusion of the parties' April 1 meeting. (Exh. A at Tr. 151, 433, and 525-26).

However, Krupin did not contact the Union, nor did anyone else from Respondent. (Exh. A at Tr. 153-54, 206, and 433). Rather, on April 5, the FMCS mediator contacted both parties to arrange for another meeting. (Exh. A at R. Exh 36, p. 2). The earliest date when all parties were available was April 22, 2010. (Exh. A at Tr. 635). On that date, the parties met for their tenth bargaining session. (Exh. A at Tr. 154). As at the parties' March 17 session, Ratliff attended with the Union committee, and FMCS mediator Gary Eder was present. (Id.). The Union's committee first met privately with the mediator. (Exh. A at Tr. 434-35). The mediator indicated that he had just met with Respondent's bargaining committee, and, that Respondent was not altering its position. (Id.). The Union's committee updated the mediator on what had occurred on April 1. (Id.). At this point, the mediator brought the parties together. (Id.). Ratliff questioned Krupin, indicating that the Union had been expecting to hear back from Krupin earlier. (Id. and Tr. 155). In response, Krupin said that Respondent was only interested in a three-year collective-bargaining agreement. (Id. at Tr. 155 and GC Exh. 49). Webber, after acknowledging the parties' discussion of April 1 and other open contractual issues, formally proposed a five-year collective-bargaining agreement with the top rate progression extended over five years. (Id. at Tr. 155, 435-36, 565, and 777).[23] Krupin asked Webber if the Union was

---

[23] Poole denied that Webber proposed a five-year collective-bargaining agreement with a five-year progression at this session. Poole acknowledged that Webber mentioned a five-year collective-bargaining agreement with a corresponding progression at this meeting, but recalled that Webber said that no one was interested in it. (Exh. A at Tr. 635-36, 670-71). Respondent's Human Resources Director, Jodie Kendall, testified that Webber raised the issue of a five-year collective-bargaining agreement, but that it was "just exploratory" and "nobody was interested in it." (Exh. A at Tr. 732-33). Webber explained that, while he was not a proponent of a collective-bargaining agreement with a longer duration, he was willing to propose it in order to make progress towards reaching agreement, and he, in fact, did so. (Exh. A at Tr. 777-79). Kendall's notes indicate that Krupin responded to Webber's proposal of a five-year collective-bargaining agreement by saying that it was difficult for Respondent to plan for 2015, but that the parties continued to discuss Webber's proposal until Respondent left the conference room. (Exh. A at Tr. 779-80 and R. Exh. 26, p. 2).

14

"wedded" to progression. (Id. at Tr. 155, 636). Webber said yes. (Id.). Krupin stated that the Respondent's committee was going down the hall to "crunch numbers," and the Respondent's committee left the table. (Id. at 155-56, 435, and 565).[24]

While the Union's bargaining committee sat in the conference room, under the impression that Respondent's bargaining committee was in a room down the hall analyzing the Union's proposal (Exh. A at Tr. 207 and 566), Poole decided to end the parties' bargaining session and leave the building, without a word to the federal mediator or the Union's bargaining committee. (Exh. A at Tr. 637 and 699-700). Poole decided to declare an impasse in negotiations. (Id. at 637). During this time, the Union's committee remained in the conference room, discussing proposals that could be modified or withdrawn (such as an expensive pension proposal) and waiting for Respondent's side to return to the table. (Id. at Tr. 156, 209-11, 217, 219, and 436). Eventually, the mediator suggested to the Union's committee that they go eat lunch because "this was going to take a while." (Id. at Tr. 156 and 436). The Union's committee left for lunch, only to discover that none of Respondent's committee members' cars were in the parking lot. (Id. at 157, 436-37, and 567). Ratliff confirmed with the mediator that Respondent's committee had left. (Id. at 437 and 567). The Union's committee then left. (Id.).

That afternoon, Krupin sent a letter to Webber, declaring that the parties were at impasse and indicating that it would proceed accordingly. (Exh. A at GC Exh. 58 and Tr. 158-59). Webber responded to Krupin by letter on the same afternoon. (Exh. A at GC Exh. 39 and Tr.

---

[24] Poole testified that Respondent's side requested a caucus before leaving the conference room, but disagreed that Respondent said it needed to "crunch the numbers." (Exh. A at Tr. 698, 719). During the administrative trial, Respondent did not call Jay Krupin as a witness, though Respondent was represented at the trial by two attorneys from the law firm of Epstein, Becker & Green, P.C., where Mr. Krupin is a partner. In the underlying administrative litigation, Counsel for the Acting General Counsel will be requesting that the Administrative Law Judge draw an adverse inference against Respondent for the failure to call Mr. Krupin as a witness. See, e.g., Desert Pines Club, 334 NLRB 265, 268 (2005)(discussing adverse inferences).

159-60).  In his letter, Webber disputed the parties were at impasse, referring to his proposal

from earlier in the day and indicating that there were "numerous issues that would have allowed

for movement by the Union." (Id. at GC Exh. 39).  Webber added that, at the parties' meeting

earlier that day, Respondent indicated that it needed to "'crunch numbers'" to respond to the

Union's most recent proposal; Webber stated that he was still waiting for a response from

Respondent.  (Id.).[25]

    The following morning, Friday, April 23, Respondent announced to its employees that it

was implementing the terms of its final offer.[26]  (Exh. A at Tr. 568-69 and 639-40).

Consequently, employees reported the Respondent's announcement to Webber. (Exh. A at Tr.

161 and 570-71).  Webber then met with Ratliff and Gibson and informed them of the unilateral

action. (Id. at Tr. 162, 439, and 527).  Ratliff decided that Respondent left the Union with no

alternative other than initiating a strike to protest Respondent's conduct. (Id. at Tr. 162-63, 440,

453-55).[27]  Shortly thereafter, Webber began preparing for a strike, making picket signs the next

morning. (Id. at 164).

    On the next workday, Monday, April 26, the Union initiated the strike at Respondent's

Upper Marlboro, Maryland facility. (Id. at 165).  Webber arrived at the facility at 5:30 a.m. with

the picket signs, and he told arriving employees of the Union's position - that they were on strike

to protest the unfair labor practice committed by Respondent in declaring impasse and

implementing the changes on April 23. (Id. at 165-66, 350, 395, and 572).  Ratliff and Gibson

---

[25] Krupin and Webber exchanged additional correspondence on April 26 and April 29. (Exh. A at GC Exh. 40-41, and Tr. 167-70 and 213-15).

[26] Since that time, Respondent has maintained its unilateral changes and has refused to rescind them. (Exh. A at GC Exh. 48 and Tr. 183, 448-49).  On July 23, Ratliff, in a letter to Krupin, demanded that Respondent rescind its unilateral changes. (Exh. A at GC Exh. 59).

[27] The Union, through counsel, filed its unfair labor practice charge specifically addressing Respondent's unilateral changes on April 27. (Exh. A at GC Exh. 1-C).

also spoke to the employees, telling them that they were on strike because the Union believed

Respondent had violated federal labor laws on April 22 and 23.  (<u>Id.</u> at Tr. 166-67, 440-41).[28]

Employees started a picket line in front of Respondent's facility, wearing picket signs that read:

**ON STRIKE**
**DAYCON**
<u>UNFAIR</u> – VIOLATES
FEDERAL LABOR LAW
**TEAMSTERS**
**UNION**
**LOCAL 639**
INTERNATIONAL BROTHERHOOD OF TEAMSTERS

(Exh. A at GC Exh. 37).

After the Union initiated the strike, Respondent sent letters to its employees, informing

them that they had been permanently replaced.  (Exh. A at GC Exhs. 53 and 66, and Tr. 738-39).

Some employees did not honor the Union's picket line, and went back to work.  (Exh. C at p. 1,

lns. 8-9, and p.2, lns. 13-14 and Attachment).  During the strike, approximately 20 to 35

employees walked the picket line each day.  (Exh. C at p. 1, lns. 13-14; Exh. B at p. 3, lns. 5-6).

During this timeframe, Respondent began hiring workers to replace the striking employees.

According to Kendall, replacement workers were given the same employee information

form to complete that any employee completes when hired.  (Exh. A at Tr. 739-40, and R. Exh.

29 and 39).[29]  Replacement workers were not specifically told to indicate that they were regular

full-time employees, but, according to Kendall, each replacement worker did so.  (<u>Id.</u>).  Kendall

testified that Respondent has treated replacement workers the same as employees hired prior to

---

[28] Ratliff and Krupin exchanged written correspondence on April 26.  (Exh. A at GC Exh. 57-58 and Tr. 441-43).
[29] Kendall also testified, and Respondent introduced documentary evidence, regarding employment offer letters Respondent has issued; these exhibits indicate Respondent used the same form letter for its job offers, pre-strike and post-strike.  (Exh. A at Tr. 784-90 and R. Exhs. 37-38).

the strike. (Id. at Tr. 740, 745). Finally, Kendall testified that the replacement workers were offered health benefits, and that, under the terms of the expired collective-bargaining agreement, temporary employees are not offered health benefits. (Id. at 745-46 and GC Exh. 2, p. 34).

Upon their hire, twenty-six replacement workers signed a form acknowledging that they had received and understood Respondent's employee handbook. (Exh. A at GC Exh. 65(a)-(y)). This form states as follows:

> I also acknowledge that I am employed as an at-will employee. Accordingly, I recognize and agree that nothing shall restrict my right to terminate my employment at any time and for any reason and nothing shall restrict the right of [Respondent] to terminate my employment at any time or for any reason. I also recognize that any promises of employment for a specified period of time or any exceptions to this policy of at-will employment are not binding upon [Respondent], unless reduced to writing and signed by an officer of [Respondent].
>
> (Id.).

At some point in time, Respondent voided each of these twenty-six forms. (Id.).[30] Each replacement worker completed a new form that did not include the above-quoted paragraph, but instead included the following:

> If the terms and conditions as outlined in this manual conflict with the terms and conditions as described in the collective-bargaining agreement (CBA) with [the Union], then the CBA controls only for those particular unionized employees.
>
> (Id.).[31]

The Union maintained its strike of Respondent through July 2. (Exh. A at Tr. 170). On that date, Webber sent Krupin an e-mail in which Webber, on behalf of the striking employees, unconditionally offered for all striking employees to return to work on the next business day,

---

[30] Kendall testified that the replacement workers were accidentally given the "non-union form" characterized by the above-quoted paragraph identifying the individual as an at-will employee. (Exh. A at Tr. 749).
[31] All but two of these forms are dated October 14 or later. (Exh. A at GC Exh. 65(a)-(y)).

July 6. (Exh. A at GC Exh. 42 and Tr. 171).[32]  In this same July 2 e-mail, Webber also requested that the parties meet again to continue bargaining. (Id. at GC Exh. 42). On that same day, Webber went to the picket line and read his e-mail aloud to the approximately 30 striking employees at Respondent's facility. (Id. at Tr. 172-73 and 397-98).

On Monday, July 6, employees arrived and were prepared to work. (Exh. A at Tr. 398-99). Respondent did not allow the employees to return to their jobs on that date. (Id.).[33] Respondent did, however, hire two replacement workers on that date. (Exh. A at GC Exh. 48, p. 3 [Howard Brown and Arquie Sanford]).[34]  On the following day, July 7, Respondent sent letters to four individual employees, informing those employees that they had until July 9 to return to work, or Respondent would fill the position with another qualified employee. (Exh. A at GC Exh. 67, pp. 1, 5, 7, and 10).[35]  Respondent has subsequently issued similar letters to seven other individual employees. (Id. at Tr. 399-400 and GC Exh. 67, pp. 2-4, 6, 8-9, and 11). [36]

---

[32] Krupin replied to Webber's e-mail the following day, July 3. (Exh. A at GC Exh. 43). Webber and Krupin subsequently exchanged additional e-mails on July 7-8. (Id. at GC Exh. 44).

[33] On July 6, Respondent's security guards prevented employees from returning to work. (Exh. B at p. 3, lns. 14-15).

[34] In addition to these two individuals hired on the same day that the employees had unconditionally offered to return to their jobs, Respondent hired another individual approximately a week later. (Exh. A at GC Exh. 48, p. 3 [Reginald Molloy]). Respondent offered a position to Mr. Molloy on June 30 (Exh. A at GC Exh. 69), but he was not hired until July 12.

[35] On July 13, the parties met at FMCS' office in Washington, D.C. with mediator Gary Edar. (Exh. A at Tr. 176-80, 445-48, and 528-31). At this meeting, Webber proposed several modifications to his proposal from the parties' April 22 meeting. Webber proposed: (a) a five-year contract with a five-year progression mechanism; (b) a $.10/hour reduction in the employees' annual wage increase (to $.55/hour); and (c) that Respondent begin participating in the Union's pension fund in the fourth year of the contract, rather than the first year. (Id. and GC Exh. 45). Krupin rejected Webber's offer in full and did not modify Respondent's proposal from the parties' February 18 session. (Id.). Respondent also indicated that it would not allow all the employees to return to their jobs. (Id.).

[36] The parties stipulated at the administrative hearing that employee Robert Redmond received a letter recalling him to work on September 25. (Exh. A at Tr. 401). The letter, dated September

After Respondent refused to permit all of the employees to return to their jobs on July 6, the employees' morale and support for the Union decreased. (Exh. B at p. 3, ln. 15). Employees who have since returned to work no longer join the striking employees on the picket line during their non-working time, and have stopped speaking to the striking employees and to Union representatives. (Exh. B at p. 4, lns. 14-19; Exh. C at p. 2, lns. 24-26, and p. 3, lns. 1-6). The number of employees on the picket line has noticeably decreased since August. (Exh. B at p. 4, lns. 20-23; Exh. C at p. 3, lns. 17-22). Striking employees no longer seek updates on the status of the parties' dispute from their own shop steward. (Exh. B at p. 4, lns. 22-26, and p. 5, ln. 1). Employees' participation on the picket line has continued to dwindle over the fall months, as has employees' morale and support for the Union. (Exh. B at p. 5, lns. 4-14; Exh. C at p. 3, lns. 25-26, and p. 4, lns. 1-5). Employees have searched for work elsewhere, and at least four employees have found employment elsewhere. (Exh. C at p. 4, ln. 8 and Attachment). Several more employees remain out of work. (Exh. C at Attachment).

## III.   THE STATUTORY SCHEME PURSUANT TO WHICH INJUNCTIVE RELIEF IS SOUGHT: THE APPLICABLE STANDARDS

Section 10(j) of the Act[37] authorizes United States district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings. Congress

---

24, states that Redmond had five days from September 24 to return to work, or his job would be offered to another qualified employee. (Exh. A at GC Exh. 54).

[37] Section 10(j) (29 U.S.C. Section 160(j)) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

recognized that the Board's administrative proceedings often are protracted.  In many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint, thereby rendering a final Board order ineffectual.  See Muffley v. Spartan Mining Co., 570 F.3d 534, 543-44 (4th Cir. 2009).[38]  Thus, Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in administrative litigation.  See Muffley, 570 F.3d at 543-44.

Section 10(j) allows United States district courts to grant relief that is deemed "just and proper."  Accordingly, the Regional Director must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the Board's favor; and (4) that an injunction is in the public interest.  See id. at 541; see also Winter v. Natural Resources Defense Council, Inc., ___ U.S. ___, 129 S.Ct. 365, 374 (2008).[39]  These criteria should be considered in the context of the underlying purpose of Section 10(j), which is to preserve the Board's remedial powers.  Muffley, 570 F.3d at 543, citing Miller v. Cal. Pac. Med. Ctr., 19 F.3d 449, 459-60 (9th Cir. 1994)(en banc).

In determining the likelihood of success, the Regional Director makes a threshold showing by producing "some evidence" in support of the unfair labor practice charge "together

---

[38] See also Scott v. Stephen Dunn & Assocs., 241 F.3d 652, 659 (9th Cir. 2001)(abrogation recognized on other grounds by McDermott v. Ampersand Publishing, LLC, 593 F.3d 950, 957 (9th Cir. 2010)); Miller v. Cal. Pac. Med. Ctr., 19 F.3d 449, 455 n.3 (9th Cir. 1994) (en banc), quoting S. Rep. No. 105, at 8, 27 (1947), reprinted in I NLRB, Legislative History of the Labor-Management Relations Act, 1947, at 414, 433 (1985).  While courts have recognized that portions of Miller and Scott have been abrogated, those cases are viable and instructive for a district court in evaluating whether to grant temporary relief under Section 10(j).  See Garcia v. Sacramento Coca-Cola Bottling Company, Inc., ___ F. Supp.2d ___, 2010 WL 3294384 at *4-*5 (E.D. Cal. Aug. 20, 2010).

[39] The Fourth Circuit has recognized and applied the Winter standard, articulated above.  See The Real Truth About Obama, Inc. v. Federal Election Commission, 575 F.3d 342 (4th Cir. 2009), cert. granted, ___ U.S. ___, 130 S. Ct. 2371 (2010), reissued in relevant part, 607 F.3d 355 (4th Cir. 2010).

with an arguable legal theory." <u>Miller</u>, 19 F.3d at 460.[40]  In assessing whether the Regional

Director has met this minimal burden, district courts must take into account that Section 10(j)

confers no jurisdiction to pass on the ultimate merits of the unfair labor practice case, and that,

ultimately, the Board's determination on the merits will be given considerable deference.  See

<u>Bloedorn v. Francisco Foods, Inc.</u>, 276 F.3d 270, 287 (7th Cir. 2001); <u>Miller</u>, 19 F.3d at 460, and

cases there cited.  The court should sustain the Regional Director's factual allegations if they are

"within the range of rationality" and, "[e]ven on an issue of law, the district court should be

hospitable to the views of the [Director], however novel." <u>Danielson v. Jt. Board</u>, 494 F.2d

1230, 1245 (2d Cir. 1974), cited with approval in <u>Miller</u>, 19 F.3d at 460.[41]  Finally, the court

should not resolve conflicts, including credibility, in the evidence.  See <u>Scott</u>, 241 F.3d at 662.[42]

        In applying traditional equitable principles to a Section 10(j) petition, the court should

consider the matter through the "prism of the underlying purpose of Section 10(j), which is to

protect the integrity of the collective bargaining process and to preserve the Board's remedial

power." <u>Scott</u>, 241 F.3d at 661 (quoting <u>Miller</u>, 19 F.3d at 459-60).  The Fourth Circuit

recognizes that the public interest is an important factor in the exercise of equitable discretion.

<u>Muffley</u>, 570 F.3d at 543.[43]  Section 10(j) thus implements the public interest in protecting the

Board's remedial power from compromise by the passage of time inherent in obtaining an

enforceable Board order.  See <u>Muffley</u>, 570 F.3d at 544.  Accordingly, in balancing the hardships

and evaluating whether irreparable injury is threatened, the court should consider whether

---

[40] <u>See also Garcia</u> at *4-*5.

[41] <u>See also Bloedorn</u>, 276 F.3d at 287 (discussing how the district court views the facts and law).

[42] <u>See also NLRB v. Electro-Voice, Inc.</u>, 83 F.3d 1559, 1570-71 (7th Cir. 1996)(reversing the district court's denial of injunction because the district court applied an incorrect standard), <em>cert. denied</em> 519 U.S. 1055 (1997).

[43] <u>See also Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312-13 (1982)(indicating courts should consider public consequences in evaluating whether to grant injunctive relief).

declining to issue the injunction will permit the passage of time to cause "a very real—and potentially irreparable—harm to the effectiveness of the Board's eventual order." Muffley, 570 F.3d at 544.

## IV. ARGUMENT

In this case, Respondent unlawfully changed its employees' terms and conditions of employment without first reaching agreement with its employees' chosen collective-bargaining representative, or without first bargaining in good faith to a lawful impasse.  Consequently, its employees exercised their rights under Section 7 of the Act and initiated a strike against Respondent in protest of this unlawful activity.  When the Union chose to end the strike and offered for the employees to unconditionally return to work, Respondent refused to allow all of the employees to return to their jobs, literally leaving its employees on the outside looking in. Respondent's actions come at a time when its employees are most vulnerable.  Not only are the employees not working because of Respondent's unfair labor practices, but they have experienced a predictable "chill" in the exercise of their Section 7 rights.  Furthermore, the Union has seen employees' support dwindle as result of Respondent's unfair labor practices. Meanwhile, Respondent continues to hold all the leverage in its collective-bargaining relationship with its employees and their chosen Union, in spite of and because of Respondent's own unlawful actions.

At the underlying administrative hearing, Respondent was tasked with the burden of establishing not only that it had bargained in good faith with the Union to a point where further bargaining would be fruitless, but also that it permanently replaced all of its employees who chose to go on strike.  As demonstrated below, Petitioner is likely to succeed on the merits of this case, as Respondent has failed to meet its burdens.  Furthermore, interim relief is needed to

prevent irreparable harm, interim relief would pose little or no harm to Respondent, and interim relief is in the public interest. Thus, a balance of the equitable factors favors the grant of interim relief.

### A. Petitioner Establishes a Likelihood of Success on the Merits

Petitioner has alleged that Respondent violated Sections 8(a)(1), (3) and (5) of the Act. At root, Respondent is charged with violating Sections 8(a)(1) and (5) by unilaterally changing employees' terms and conditions of employment without first bargaining in good faith to impasse with its employees' union, and then failing and refusing to rescind those changes when its employees' union demanded that it do so. Additionally, Respondent is charged with violating Sections 8(a)(1), (3) and (5) of the Act by failing and refusing to reinstate its employees after those employees offered to unconditionally return to work. At the underlying administrative hearing, Respondent had the burden of establishing that its conduct was lawful. As discussed below, Respondent has failed to meet its burdens.

Under the Act, an employer with employees represented by a union may not unilaterally change its employees' terms and conditions of employment. When an employer and a union have a collective-bargaining agreement that has expired, the employer generally must maintain the terms of that agreement until the parties reach a new agreement, or the parties, after bargaining in good faith, reach an impasse in their negotiations. See, e.g., Newcor Bay City Division of Newcor, 345 NLRB 1229, 1237-38 (2005). Such an impasse occurs whenever negotiations reach that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless. Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539, 543 (1988)("A genuine impasse in negotiations is synonymous with a deadlock; the parties have discussed a subject or subjects in good faith, and, despite their best efforts to achieve agreement with respect to such, neither party is willing to move from its respective position."). The party asserting impasse has the burden of proof. North Star Steel Co., 305 NLRB 45 (1991), enf'd 974 F.2d 68 (8th Cir. 1992).

In this case, Respondent has not carried its burden.[44]  When the parties met on April 22, Respondent gave the Union the impression that it would be evaluating the Union's proposal of a five-year collective-bargaining agreement with a five-year progression for employees to reach the "top rate" in their respective classifications.  The Union's proposal alone indicates that the parties were still engaged in legitimate negotiations and not deadlocked.  Furthermore, there were a number of outstanding issues, such as Respondent's proposed "economic distress" clause and the Union's pension proposal.  But rather than return to the bargaining table and continue bargaining with the Union, Respondent left the meeting without so much as a word to the Union's bargaining committee or the federal mediator, and then dispatched a letter to the Union in which it unilaterally, and prematurely, declared that the parties were at impasse.  Rather than responding to the Union's proposal as well as the Union's assertion that the parties were not at an impasse, Respondent abruptly terminated the bargaining process and unilaterally changed employees' terms and conditions of employment the following day.  Given the record evidence, Respondent will not be able to meet its burden of proving that both Respondent and the Union were at the ends of their respective bargaining "ropes," and that the parties were at impasse.  Thus, Petitioner is highly likely to prevail in showing that Respondent violated the Act when it terminated the bargaining process, prematurely declared impasse, and unilaterally changed employees' terms and conditions of employment.[45]

---

[44] In evaluating the merits of the action, the district court's role is not to resolve contested factual questions.  Rather, the conflicts in evidence and credibility resolutions are to be resolved in favor of the Regional Director moving for injunctive relief.  The Regional Director's version of the facts "should be given the benefit of the doubt and the district court should not attempt to resolve credibility disputes." Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1051-52 (2d Cir. 1980). See also Gottfried v. Frankel, 818 F.2d 485, 493-94 (6th Cir. 1987) (indicating that a district court is not to resolve conflicts in the evidence; respondent's attack on credibility of the Board's witness merely establishes conflict in the evidence); Fuchs v. Jet Spray Corp., 560 F. Supp. 1147, 1150- 1 (D. Mass. 1983), aff'd 725 F.2d 664 (1st Cir. 1983).

[45] See Grinnell Fire Protection Systems Co., 328 NLRB 585, 585-86 (1999)(finding respondent prematurely declared impasse and unlawfully implemented changes), enfd 236 F.3d 187, 195-200 (4th Cir. 2000), cert. denied 534 U.S. 818 (2001).

Likewise, Petitioner is equally likely to prevail in proving that Respondent violated the Act by refusing to rescind the changes it made on April 23. By letter of July 23, the Union demanded that Respondent rescind the unilateral changes it made on April 23 and restore the employees' terms and conditions that had been in effect prior to April 23. Respondent replied on July 27, rejecting the Union's demand. To date, Respondent has not rescinded the changes it made on April 23. As discussed above, Petitioner is likely to succeed on the merits of the allegation that Respondent's changes were unlawful. Consequently, Petitioner is just as likely in succeeding on the merits of the allegation that Respondent has unlawfully refused to rescind those changes.

With this likelihood of success on the merits in mind, Petitioner is highly likely to succeed on the merits of the allegation that Respondent has violated Sections 8(a)(1), (3), and (5) of the Act by refusing to reinstate employees to their jobs after the Union unconditionally offered for the employees to return to work. Based on the evidence from the administrative hearing, Petitioner has established that the employees were engaged in an unfair labor practice strike on April 26, and consequently that the employees were entitled to return to their jobs upon their unconditional offer to return to work.

Unfair labor practice strikers are entitled to prompt reinstatement upon their unconditional offer to return to work, even if the employer must discharge replacement workers in order to reinstate them. Mastro Plastics Corp., v. NLRB, 350 U.S. 270, 278 (1956). The employer has the burden of proving a legitimate and substantial business justification for its refusal to reinstate striking employees. NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378 (1967). To determine whether a strike is an unfair labor practice strike, the Board looks to whether the strike has been caused in whole or in part by an unfair labor practice committed by the employer. Child Development Council of Northeast Pennsylvania, 316 NLRB 1145, 1145-46 (1995), enfd. 77 F.3d 461 (3rd Cir. 1996); Citizens National Bank of Willmar, 245 NLRB 389, 391 (1979) enf'd. mem., 644 F.2d 39 (D.C. Cir. 1981). As long as an unfair labor practice has "anything to do with" causing a strike, it will be considered an unfair labor practice strike.

NLRB v. Cast Optics Corp., 458 F. 2d 398, 407 (3rd Cir. 1972), *cert. denied*, 419 U.S. 850

(1972). That a strike may also have economic objectives does not change its status from an

unfair labor practice strike to an economic strike. NLRB v. Fitzgerald Mills Corp., 313 F.2d

260, 269 (2d Cir. 1963), *cert. denied* 375 U.S. 834 (1963). The employer's unfair labor practice

does not have to be the sole cause or even the major cause or aggravating cause for the strike; it

is sufficient if the unfair labor practice is a contributing factor. Teamsters Local 515 v. NLRB,

906 F.2d 719, 723 (D.C. Cir. 1990), *cert. denied* 498 U.S. 1053 (1991). A strike may be an unfair

labor practice even when the employer's unfair labor practice is not a major cause of the strike; the

unfair labor practice need only be a contributing factor to the strike. RCG (USA) Mineral Sands,

Inc., 332 NLRB 1633, 1633 (2001), *enfd.* 281 F.3d 442 (4th Cir. 2002).

Contrasted with an unfair labor practice striker, an economic striker who unconditionally

offers to return to work is entitled to immediate reinstatement unless the employer can show a

legitimate and substantial business justification for refusing to reinstate the former striker, such

as that the employee has been permanently replaced. Mackay Radio & Telegraph Co. v. NLRB,

304 U.S. 333, 345-346 (1938). An employer is not required to discharge those hired to fill the

jobs of economic strikers if the employer assured those replacements that their employment

would be permanent. Id. This is an affirmative defense, and the employer has the burden of

proving that it hired permanent replacements. Associated Grocers, 253 NLRB 31 (1980), *enfd.*

672 F.2d 892 (D.C. Cir. 1981), *cert. denied* 459 U.S. 825 (1982). To meet its burden, the

employer must show a mutual understanding with the replacements that they are permanent.

Hansen Bros. Enterprises, 279 NLRB 741, 742 (1986), *enfd. mem.* 812 F.2d 1443 (D.C. Cir.

1987), *cert. denied* 484 U.S. 845 (1987). If an employer demonstrates that economic strikers

have been permanently replaced, the economic strikers would have a right to reinstatement when

a job becomes available. Laidlaw Corp., 171 NLRB 1366 (1968), *enfd* 414 F.2d 99 (7th Cir.

1969), *cert. denied* 397 U.S. 920 (1970).

In this case, Petitioner demonstrated in the administrative hearing that the employees'

strike was triggered by Respondent's unlawful changes to the employees' terms and conditions

of employment on April 23, thus clearly establishing that the employees were engaged in an unfair labor practice strike. As revealed in the record, the Union decided to implement the strike immediately after Respondent unilaterally changed employees' terms and conditions of employment on April 23. Although employees voted in February to authorize a potential strike, the Union did not act on that authorization at that time, but instead continued to bargain for a new agreement. Throughout this time, the employees continued to work under the terms and conditions of employment from the expired collective-bargaining agreement, and the Union did not initiate a strike. Not until Respondent prematurely terminated the parties' bargaining and unilaterally changed employees' terms and conditions of employment did the employees respond with a strike. Thus, there is a clear temporal nexus between the unfair labor practice and the strike protesting the unlawful conduct. Further, since the strike began on April 26, the Union has consistently stated that it is an unfair labor practice strike. The Union has orally communicated as much to the employees on the picket line, and the picket signs state that the strike is to protest Respondent's unfair labor practice. Thus, the record supports a conclusion that this was an unfair labor practice strike.

On July 2, the Union made a written, unconditional offer to Respondent for the striking employees to return to their jobs on the next business day, July 6. On that day, employees attempted to return to work, but Respondent did not allow the employees to return to their jobs. With the strike established as an unfair labor practice strike, the striking employees were entitled to reinstatement as of July 6, and Petitioner is likely to succeed on the merits on that Respondent unlawfully failed to reinstate the striking employees.[46]

Yet even if the strike is not considered an unfair labor practice strike, Petitioner is still likely to succeed on the merits, as Respondent has not proven it hired permanent replacement workers. The extent of Respondent's efforts at the administrative hearing to prove that it had

---

[46] See Dorsey Trailers, Inc. v. NLRB, 233 F.3d 831, 839 (4th Cir. 2000)(finding that substantial evidence supported NLRB's conclusion that respondent's failure to reinstate unfair labor practice strikers violated Sections 8(a)(3) and (1).

hired permanent replacement workers consisted of: (1) indicating to the striking employees that they had been permanently replaced; (2) using the same forms (employee information forms and employment offer letters) as it had used prior to the strike; (3) treating the replacement workers as it had treated employees prior to the strike; and (4) having replacement workers initially fill out the "non-union" at-will employee form, and then correcting those forms to the "union" form well after Petitioner had issued complaint. In fact, Respondent's Human Resources Director testified that replacement workers had not been told that they were regular full-time employees, though the workers considered themselves as such. Furthermore, three replacement workers have a date-of-hire on or after July 6, when the striking employees were to have been returned to their jobs. In sum, Respondent is not likely to be found by the Board to have met its burden. Therefore, regardless of whether the strike was an unfair labor practice strike or an economic strike, Petitioner is likely to succeed before the Board regarding the allegation that Respondent has unlawfully denied the employees reinstatement under Sections 8(a)(3) and (5) of the Act.

### B. Interim Relief is Necessary to Prevent Irreparable Harm

Section 10(j) relief is "just and proper" to prevent Respondent's violations from causing irreparable harm in numerous respects. In this case, irreparable injury consists of the following: harm to the employees' Section 7 rights (including "chilling" employees' lawful exercise of their Section 7 rights, as well as preserving the employees' free choice of the Union as their collective-bargaining representative); harm to the Union's ability to bargain effectively on behalf of the employees it represents (resulting both from Respondent's unlawful practices and the effect that those practices have on employee support for the union); and harm to the Board's ability to effectively remedy violations of the Act.[47]

---

[47] See, e.g., Overstreet v. El Paso Disposal, L.P., __ F.3d __, 2010 WL 4351961, at *8 (5th Cir. November 4, 2010) (granting interim reinstatement of unfair labor practice strikers).

First addressing the harm to employees, irreparable injury is certain if relief is not granted.  Such relief to the employees is critical to protect employee free choice and needed to reassure other employees that they are free to support the Union.[48]  The further passage of time will only erode the employees' support for the Union and destroy the Union's effectiveness.  Respondent's unlawful actions have already produced such a result; some employees refused to honor the picket line, and employee support for the Union has noticeably dwindled since the employees were prevented from returning to their jobs.  The delay in the administrative process to remedy Respondent's unfair labor practices has and will continue to undermine the Union in the eyes of the employees.  Courts have recognized that the refusal to reinstate unfair labor practice strikers causes irreparable harm.[49]  Without interim relief, the effectiveness of the Board's ultimate reinstatement remedy to the employees is threatened—the more time that passes, the more likely it is that many of the employees will be unavailable to accept offers of employment under a Board order.  As a result of this likelihood, few of the employees may be willing and able to accept employment under a future Board order.  Interim reinstatement of the

---

[48] See id. (employer's failure to reinstate unfair labor practice strikers was direct cause of employee disaffection).  See also NLRB v. Electro-Voice, Inc., 83 F.3d at 1573; Blyer v. Pollari Electric, 141 F. Supp. 2d 326, 330-31 (E.D.N.Y. 2001).

[49] See D'Amico v. United States Service Industries, Inc., 867 F. Supp. 1075, 1086-87 (D.D.C. 1994) ("in the absence of injunctive relief, adverse job actions taken against union supporters and the failure to reinstate unfair labor violation strikers promptly to 'substantially equivalent' positions may permanently deprive the workplace of the presence of union supporters and suggest that workers may be retaliated against for their participation in organizational activities"); Silverman v. Reinauer Transportation Companies, 1988 WL 159172 at *4 (S.D.N.Y. Nov. 15, 1988) ("[strikers] who may be forced to find new jobs and relocate themselves indicates that the Union members will suffer irreparable harm if [they] remain on strike until the NLRB makes its final decision and until that decision is enforced by an order from a Circuit Court of Appeals.")(unpublished), aff'd 880 F.2d 1319 (2d Cir. 1989)(table).  See also Pascarell v. Orit Corp., 705 F. Supp. 200, 204 (D.N.J. 1988) ("if . . . Union supporters are excluded from the bargaining process pending resolution of unfair labor practice charges before the NLRB, many of the supporters will lose confidence in the Union's ability to come to their aid."), aff'd 866 F.2d 1412 (3rd Cir. 1988)(table).

employees would preclude the possibility that they might permanently scatter and be unavailable for reinstatement under a Board order.[50]  Such a possibility would render the Board's remedy useless, and Respondent would be able to rid its workforce of Union supporters.[51]  Employees have searched for work elsewhere, and some have started working for other employers.

Second, addressing the harm to the Union, Respondent's unilateral changes, if allowed to continue, could severely erode the "prestige and legitimacy" of the Union in the eyes of the employees.[52]  Employee support will predictably erode as time passes and the Union is unable to adequately protect the employees or affect their working conditions through collective bargaining while their case is pending before the Board.  See Asseo v. Pan American Grain Co., Inc., 805 F.2d 23, 26-27 (1st Cir. 1986)("[e]mployee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining") (quoting Electrical Workers v. NLRB (Tiidee Products, Inc.), 426 F.2d 1243, 1249 (D.C. Cir. 1970), cert. denied 400 U.S. 950 (1970)).  Such an erosion will predictably diminish the Union's strength at the bargaining table.[53]  The Union's weakened state may, in turn, destroy any residual support remaining amongst the employees.[54]  Unilateral changes also strike at the heart of a union's ability to represent employees, namely, by allowing an employer to enjoy the fruits of its

---

[50] See Muffley, 570 F.3d at 543-44; Electro-Voice, Inc., 83 F.3d at 1573; Aguayo v. Tomco Carburetor Co., 853 F.2d 744, 749 (9th Cir. 1988) overruled in other part by Miller, 19 F.3d at 457; Silverman v. Imperia Foods, Inc., 646 F. Supp. 393, 400 (S.D.N.Y. 1986).  See also Bloedorn, 276 F.3d at 299.

[51] Pye v. Excel Case Ready, 238 F.3d 69, 74-75 (1st Cir. 2001).

[52] Morio v. North American Soccer League, 632 F.2d 217, 218 (2d Cir. 1980).

[53] See NLRB v. Hardesty Co., Inc., 308 F.3d 859, 865 (8th Cir. 2002) ("unilateral action will also often send the message to the employees that their union is ineffectual, impotent, and unable to effectively represent them").

[54] See Asseo v. Pan American Grain Co., Inc., 805 F.2d at 26-27.

unlawful conduct and gain an undue bargaining advantage.[55]  For instance, Respondent can use

restoration of the proper status quo as "bargaining bait" to force acceptance of its other

bargaining proposals.[56]  Indeed, unilateral changes "must of necessity obstruct bargaining,

contrary to the congressional policy."[57]  Therefore, because the Union's collective strength is

essential for meaningful collective bargaining, interim relief preserving the Union's support is

equitably necessary to preserve the efficacy of the Board's bargaining order and protect the

public interest.[58]  Ordering temporary relief offers the best chance of restoring and preserving the

Union's support to bargain a contract, maintaining the efficacy of the Board's order, and

preserving the employees' choice of the Union.

### C.  The Balance of Harms Favors the Grant of Interim Relief

Balancing the hardships clearly favors granting interim relief.[59]  The Union has already

lost employee support, and the employees' choice of the Union will suffer irreparable harm

absent interim relief.  In contrast, Respondent will suffer little, if any, harm if injunctive relief,

---

[55] See Herman Sausage Co., 122 NLRB 168, 172 (1958), enfd. 275 F.2d 229 (5th Cir. 1960); Little Rock Downtowner, Inc., 168 NLRB 107, 108 (1967), enfd. 414 F.2d 1084 (8th Cir. 1969).
[56] Florida-Texas Freight, Inc., 203 NLRB 509, 510 (1973), enfd. 489 F.2d 1275 (6th Cir. 1974) (unremedied unilateral subcontracting impedes parties' bargaining process).  See also Southwest Forest Industries, Inc. v. NLRB, 841 F.2d 270, 275 (9th Cir. 1988) (restoration of status quo ensures "meaningful bargaining").
[57] NLRB v. Katz, 369 U.S. 736, 747 (1962).
[58] See, e.g., Muffley v. APL Logistics, 2008 WL 544455 at *5 (W.D. Ky. 2008)(unpublished); Silverman v. Major League Baseball Player Relations Committee, Inc., 880 F. Supp. 246, 259 (S.D.N.Y. 1995), affd. 67 F.3d 1054, 1062 (2d Cir. 1995) (interim rescission of unilateral change appropriate to "salvage some of the important bargaining equality that existed" prior to violations).  See also Morio, 632 F.2d at 218; Overstreet v. Thomas Davis Medical Centers, P.C., 9 F. Supp. 2d 1162, 1167 (D. Ariz. 1997); Overstreet v. El Paso Disposal, LLC, 668 F. Supp. 2d 988, 1015 (W.D. Tex. 2009), aff'd in relevant part __F.3d__, 2010 WL 4351961 (5th Cir. Nov. 4, 2010).
[59] See Muffley, 570 F.3d at 544 (employer failed to show it would be harmed by interim reinstatement of discriminatees).  See also Norelli v. Fremont-Rideout Health Group, 632 F. Supp. 2d 993, 1003 (E.D. Cal. 2009)(deciding that the balance weighed against respondent, which gave no evidence on how an injunction would disrupt its operations), stay denied 2009 WL 2015062 (E.D. Cal. April 22, 2009).

including an interim order requiring the Employer to reinstate the former strikers, is granted.

Respondent will merely be required to do what the law already requires. Interim relief is largely

confined to three items: (a) requiring Respondent return to the bargaining table and bargain in

good faith; (b) requiring Respondent to rescind its unilateral changes, upon request; and (c)

reinstate its own employees. Taken in turn, this relief involves little to no harm to Respondent.

The costs—the time and money spent on collective bargaining—fall on both parties and do not

defeat a request for interim relief. See Scott, 241 F.3d at 669. Furthermore, an interim

bargaining order does not last forever,[60] and Respondent is not compelled to agree to any specific

proposal, but must only bargain in good faith. See D'Amico v. Townsend Culinary, Inc., 22 F.

Supp. 2d 480, 490-91 (D. Md. 1998).[61]  While not penalizing Respondent, the granting of relief

will level the field for the employees' collective-bargaining representative and promote a

harmonious relationship between Respondent and the Union. Respondent will continue its

normal business operations with its own pre-existing, experienced employees. These employees'

statutory rights outweigh any employment rights of replacement employees.[62]

### D.  Interim Relief is in the Public Interest

In evaluating a 10(j) petition, district courts should consider the matter through the

"prism of the underlying purpose of Section 10(j), which is to protect the integrity of the

---

[60] See, e.g., Seeler v. Trading Port, Inc., 517 F.2d 33, 40 (2d Cir. 1975) ("there is nothing permanent about any bargaining order . . . particularly an interim order which will last only until the final Board decision").

[61] See also Dunbar v. Onyx Precision Services, Inc., 129 F. Supp. 2d 230, 239 (W.D.N.Y. 2000); Gottfried v. Mayco Plastics, Inc., 472 F. Supp. 1161, 1167 (E.D. Mich. 1979) ("It is important also to bear in mind that the only obligation imposable is the duty to bargain in good faith. The NLRB does not compel any particular agreement or any agreement at all."), affd. mem. 615 F.2d 1360 (6th Cir. 1980).

[62] Asseo v. Bultman Enterprises, Inc., 913 F. Supp. 89, 97 (D. P.R. 1995). See also Bloedorn, 276 F.3d at 299-300; Aguayo v. Tomco Carburetor Co., 853 F.2d at 750; Kobell v. Beverly Health & Rehabilitation Services, Inc., 987 F. Supp. 409, 417 (W.D. Pa. 1997), affd. mem. 142 F.3d 428 (3d Cir. 1998), cert. denied, 525 U.S. 1121 (1999).

collective bargaining process and to preserve the Board's remedial power while it processes the charge." Scott, 241 F.3d at 661, quoting Miller, 19 F.3d at 459-60. The Fourth Circuit recognizes that the public interest is an important factor in the exercise of equitable discretion. Muffley, 570 F.3d at 543. Section 10(j) thus implements the public interest to protect the Board's remedial power from compromise by the passage of time inherent in obtaining an enforceable Board order. See Muffley, 570 F.3d at 544-545 (noting 10(j) relief remained proper despite alleged delay in seeking relief because of, among other reasons, "strong public policy interest favoring some injunctive relief").[63]

In this case, the public interest is best served and furthered by the issuance of an injunction in these cases. This Court's grant of an injunction would uphold the integrity of the Act that the Board enforces, while preventing Respondent from continuing to violate federal law.[64] The rights at stake in the underlying administrative proceeding, as well as this action, are federally-protected rights of the employees to engage in collective activity, including the right to choose a collective-bargaining representative to negotiate with their employer over their terms and conditions of employment, as well as the right to strike. The public interest is best served by enforcing these rights, as well as the policies underlying the National Labor Relations Act. Respondent has interfered with these rights by prematurely declaring impasse and foreclosing the bargaining process with the Union. Subsequently, Respondent compounded its unlawful activity by refusing to reinstate its employees after they chose to protest Respondent's unlawful actions. Temporary injunctive relief serves the public interest by ensuring that Respondent's unfair labor

---

[63] See also Bloedorn, 276 F.3d at 300 "[T]he interest at stake in a section 10(j) proceeding is 'the public interest in the integrity of the collective bargaining process' . . . [and] [t]hat interest is placed in jeopardy when the protracted nature of Board proceedings threatens to circumscribe the Board's ability to fully remediate unfair labor practices" (citations omitted).

[64] D'Amico v. United States Service Industries, Inc., 867 F. Supp. at 1085-86 ("the public interest in a case involving alleged unfair labor practices under the Act lies in ensuring that the purposes of the statute are furthered and that the processes of the Board, and any ultimate remedies it imposes, are effective.")

practices do not succeed.[65]   In seeking this injunction, Petitioner is attempting to protect the

employees' Section 7 rights, preserve the remedial power of the Board, and safeguard the parties'

collective-bargaining relationship.[66]

---

[65] Cf. Overstreet v. El Paso Disposal, L.P., 2010 WL 4351961, at *8("a refusal to reinstate in this case would merely reward [the employer] for its unfair labor practices, as it would gain a benefit from its decision to deny the right of unfair labor practice strikers to be reinstated after they stop working").

[66] See, e.g., Bloedorn, 276 F.3d at 300("the interest at stake in a section 10(j) proceeding is 'the public interest in the integrity of the collective bargaining process' … [t]hat interest is placed in jeopardy when the protracted nature of Board proceedings threatens to circumscribe the Board's ability to fully remediate unfair labor practices"). See also Lineback v. Spurlino Materials, LLC, 546 F.3d 491, 502 (7th Cir. 2008).

## V.   CONCLUSION

For the foregoing reasons, I respectfully submit that the relief requested by this

Petition is equitably necessary and is "just and proper" within the meaning of Section 10(j) of the

Act.  I respectfully request that this Court grant the relief prayed for in the Petition herein.

Dated in Baltimore, Maryland, this 17th day of December 2010.

Respectfully submitted,


Sean R. Marshall (Bar # 29418)
Attorney for Petitioner
National Labor Relations Board, Region 5
103 S. Gay Street, 8th Floor
Baltimore, MD 21202
410-962-2785  Office
410-962-2198  Fax
E-mail: sean.marshall@nlrb.gov


Albert W. Palewicz (MD Trial Bar #01666)
Regional Attorney
National Labor Relations Board, Region 5
103 S. Gay Street, 8th Floor
Baltimore, MD 21202
410-962-2811  Office
410-962-2198  Fax
albert.palewicz@nlrb.gov